# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>Eight digital devices seized on November 21, 2017 and<br>currently in the custody of Baldwin Park Police Department<br>in Baldwin Park, California | )<br>)<br>)<br>)<br>)<br>)    Case No.  2:18-MJ-00140 |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A

located in the _____Central_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 471, 472, 371, 922(g), 922(o)<br>21 U.S.C. 841, 846 | See attached Affidavit |

The application is based on these facts:

See attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Brian L, Anderson, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____

_____
*Judge's signature*

City and state: Los Angeles, California

Hon. Steve Kim, U.S. Magistrate Judge
*Printed name and title*

SAUSA: Kyle Ryan x3159

## ATTACHMENT A

PREMISES TO BE SEARCHED

The following digital devices, (collectively, the "SUBJECT DEVICES") were seized on November 21, 2017, and are currently maintained in the custody of the Baldwin Park Police Department in Baldwin Park, California:

1.    A grey HTC Windows cell phone;

2.    A white iPhone with shattered screen, bearing serial number 3588210540831;

3.    A white iPhone with silver backing, bearing serial number 0134320087475;

4.    A white iPhone with silver backing, bearing serial number 0134390059994;

5.    A black Intel Netbook computer, bearing serial number XHWEWT826;

6.    A clear plastic flash drive with blue internal workings;

7.    A silver Sony Vaio laptop computer, bearing serial number (Service Tag) A222HCWD; and

8.    A red Sony Vaio laptop computer, bearing serial number (Service Tag) C1029XD0.

**ATTACHMENT B**

## I. ITEMS TO BE SEIZED

1.    All records relating to violations of Title 18, United States Code, Sections 471 (Making Counterfeit Obligations or Securities of the United States), 472 (Possessing Counterfeit Obligations or Securities of the United States), 371 (Conspiracy), 922(g)(1) (Prohibited Person in Possession of a Firearm), 922(o) (Possession of a Machinegun), and Title 21, United States Code, Sections 841 (Possession with Intent to Distribute a Controlled Substance), and 846 (Conspiracy to Possess with Intent to Distribute a Controlled Substance) (collectively, the "SUBJECT OFFENSES").

a.    Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show address book information, including all stored or saved telephone numbers.

b.    Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls.

c.    Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp Messenger), SMS text, email communications or other text or

written communications sent to or received from any digital device.

d.   Data, records, documents, programs, applications or materials relating to the purchase of firearms, including ledgers, correspondence, receipts, records, and documents noting price, quantities, and/or times when firearms were bought, sold, or otherwise distributed.

e.   Audio recordings, pictures, video recordings or still captured images on phone memory cards, or other storage related to firearms.

f.   Any SUBJECT DEVICE which is itself or which contains evidence, contraband, fruits, or instrumentalities of the SUBJECT OFFENSES, and forensic copies thereof.

g.   With respect to any SUBJECT DEVICE containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii

iii. evidence of the attachment of other devices;

iv. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v. evidence of the times the device was used;

vi. passwords, encryption keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii. records of or information about Internet Protocol addresses used by the device;

ix. records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

## II. <u>SEARCH PROCEDURE FOR DIGITAL DEVICES</u>

2. In searching the SUBJECT DEVICES (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a. Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") may search any SUBJECT DEVICE capable of being used to facilitate the above-listed violations or containing data falling within the scope of the items to be seized.

b.   The search team will, in its discretion, either search each SUBJECT DEVICE where it is currently located or transport it to an appropriate law enforcement laboratory or similar facility to be searched at that location.

c.   The search team shall complete the search of the SUBJECT DEVICES as soon as is practicable but not to exceed 120 days from the date of issuance of the warrant.  The government will not search the digital devices beyond this 120-day period without obtaining an extension of time order from the Court.

d.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each SUBJECT DEVICE capable of containing any of the items to be seized to the search protocols to determine whether the SUBJECT DEVICE and any data thereon falls within the scope of the items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of the items to be seized.

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool

Kit), which tools may use hashing and other sophisticated techniques.

e.    If the search team, while searching a SUBJECT DEVICE, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that SUBJECT DEVICE pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

f.    If the search determines that a SUBJECT DEVICE does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the SUBJECT DEVICE and delete or destroy all forensic copies thereof.

g.    If the search determines that a SUBJECT DEVICE does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

h.    If the search determines that the SUBJECT DEVICE is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

i.     The government may also retain a SUBJECT DEVICE
if the government, prior to the end of the search period,
obtains an order from the Court authorizing retention of the
device (or while an application for such an order is pending),
including in circumstances where the government has not been
able to fully search a device because the device or files
contained therein is/are encrypted.

j.     After the completion of the search of the SUBJECT
DEVICES, the government shall not access digital data falling
outside the scope of the items to be seized absent further order
of the Court.

3.     The special procedures relating to digital devices
found in this warrant govern only the search of digital devices
pursuant to the authority conferred by this warrant and do not
apply to any search of digital devices pursuant to any other
court order.

## **AFFIDAVIT**

I, Brian L. Anderson, being duly sworn, declare and state as follows:

## I. **PURPOSE OF AFFIDAVIT**

1.    This affidavit is made in support of a criminal complaint and an arrest warrant for ALDO CAOSON DO ("DO") for a violation of Title 18, United States Code, Section 471 (Making Counterfeit Obligations or Securities of the United States).

2.    This affidavit is also made in support of an application for a search warrant to search the eight digital devices seized on November 21, 2017, and currently in the custody of the Baldwin Park Police Department ("BPPD") (collectively, the "SUBJECT DEVICES"), which are described more fully below and in Attachment A, for evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 471 (Making Counterfeit Obligations or Securities of the United States), 472 (Possessing Counterfeit Obligations or Securities of the United States), 371 (Conspiracy), 922(g)(1) (Prohibited Person in Possession of a Firearm), 922(o) (Possession of a Machinegun), and Title 21, United States Code, Sections 841 (Possession with Intent to Distribute a Controlled Substance), and 846 (Conspiracy to Possess with Intent to Distribute a Controlled Substance) (collectively, the "SUBJECT OFFENSES"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

3.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and

information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrant and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND FOR SPECIAL AGENT BRIAN ANDERSON

4. I am a Special Agent ("SA") with the United States Secret Service ("USSS") and have been so employed since July 2016. As an SA with the USSS, my duties and responsibilities include conducting criminal investigations of individuals that have allegedly violated federal criminal statutes set forth in Title 18 of the United States Code. I graduated from the Criminal Investigator Training Program at the Federal Law Enforcement Training Center in Glynco, Georgia, which included detailed training in conducting criminal investigations, and the USSS SA Training Course in Beltsville, Maryland, which included detailed training in the U.S. currency manufacturing process, methods to distinguish genuine currency from counterfeit U.S. currency, and tactics/techniques used by individuals involved in the production of counterfeit currency.

5. Further, I have consulted with other USSS agents, and local law enforcement officers on violent crime, and I have thereby become familiar with the methods and practices of violent criminals and prohibited possessors who possess firearms, including the use of digital devices related to these

2

offenses.  As a result of my training and experience, I am
familiar with federal laws concerning weapons violations.  I am
also familiar with the ways in which digital devices are used to
facilitate and conceal counterfeiting and financial crimes.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

6.    On November 21, 2017, BPPD officers were sent to a
traffic accident, which had occurred on the 4300 block of Harlan
Street.  On the way to the accident, BPPD dispatch told the
responding officers that a male driving a blue BMW M3 collided
into two parked vehicles.  At the scene, BPPD saw a man, later
identified as DO, standing next to the open driver side door of
a blue BMW sedan.  The BMW had front end bumper damage.  BPPD
officers searched DO and found a clear glass pipe, a clear
plastic baggy containing a white crystalline substance
resembling methamphetamine, and two white folded counterfeit
$100 bills.  BPPD officers arrested DO.  Prior to impounding the
BMW, BPPD conducted an inventory of the BMW and its contents.
Officers found approximately $26,500 in fake federal reserve
notes ("FRNs"), a printer/scanner, multiple small clear plastic
baggies, a scale with a white powdery substance on it, several
letters addressed to DO at 4069 Harlan Avenue, Baldwin Park,
California, and the SUBJECT DEVICES.

7.    Later the same day, pursuant to a state search
warrant, BPPD officers searched DO's residence and found paint
solvents and green dyes.  I understand, based on my training and
experience, that these are commonly used in the manufacture of
counterfeit currency.  BPPD officers also found a loaded assault

rifle with two side-by-side large capacity magazines and a
Remington 12 Gauge shotgun.

### IV. <u>STATEMENT OF PROBABLE CAUSE</u>

8.    From my review of BPPD investigation reports, my
conversations with law enforcement officers, and my own
investigation, I know the following:

**A.    Traffic Accident and Arrest of DO**

9.    On or about November 21, 2017, BPPD Officer Camacho
was called to the scene of an accident involving a blue BMW
sedan.  Upon arrival, he saw a male standing next to the open
driver side door of a blue BMW sedan.  The BMW had front end
bumper damage.  The male, later identified as DO, said that he
was the driver of the BMW.  He also said, "I was driving and
suddenly crashed, but I don't know how."

10.    Officer Camacho spoke to M.C., a witness to the car
accident.  M.C. said that she was about to cross the street when
the BMW suddenly passed her and collided with a parked car.
M.C. saw DO get out of the BMW.  M.C. did not see anyone else
inside the BMW.

11.    Officer Camacho asked DO for his driver's license,
registration, and insurance.  DO placed his right hand into his
front right pocket.  Officer Camacho noticed that DO's eyes were
wide open.  DO continued to look at Officer Camacho without
removing his hand from his pocket for over ten seconds.  Based
on DO's nervous behavior, Officer Camacho told DO to keep his
hands out of his pocket.  Officer Camacho asked DO why he was so
nervous.  DO replied, "I'm going to be honest, I have a pipe in

my pocket." Officer Camacho searched DO and found a clear glass pipe in his front right pocket and a clear plastic baggy containing a white crystalline substance resembling methamphetamine in his front left pocket.

12. Officer Camacho also found two white, folded $100 bills in DO's front left pocket. Officer Camacho noticed that the bills were the same size as a genuine $100 bill, but the bills were white and contained black faded ink without visible security features. Officer Camacho noted that the bills did not feel like genuine currency; rather, they felt like textured resume paper. Officer Camacho showed DO the bills, and DO said, "the bank gave me those."

13. Officer Camacho asked DO when he last used methamphetamine. DO replied, "Early this morning sir." After conducting field sobriety tests, officers determined that DO was under the influence of a controlled substance. BPPD officers placed DO under arrest and transported him to the BPPD jail.

14. Officers Cervantes and Camacho took an inventory of the BMW before impounding it. Officer Camacho found printed sheets of $100 bills in a clear plastic box inside the trunk. There were over 100 paper sheets with $100 bills printed on them. Officer Camacho also found 24 bleached genuine $1 bills, a portable laptop, a printer/scanner, multiple small clear plastic baggies, a scale with a white powdery substance on it, several letters addressed to DO at 4069 Harlan Avenue, Baldwin Park, California, and the SUBJECT DEVICES.

5

15.  At the BPPD jail, officers read DO his rights per the BPPD <u>Miranda</u> form.  DO said that he did not want to discuss the facts of the case unless his attorney was present.  No further questions were asked.

**B.    Search of DO's Residence**

16.  On November 21, 2017, pursuant to a state search warrant signed by Superior Court Judge Curtis A. Kin, BPPD officers searched DO's residence, 4069 Harlan Avenue, Baldwin Park, California.  At the residence, BPPD officers talked to DO's girlfriend, Eva Wei Huang, and DO's mother, Ha Thi Tron.

17.  Huang said that she and DO lived in the master bedroom on the west side of the house.  BPPD officers searched the master bedroom and found a loaded assault rifle with two side-by-side large capacity magazines in plain view inside the closet.  BPPD officers also found a Remington 12 Gauge shotgun in plain view in the corner of the bedroom.  BPPD officers also found paint solvents and green color dyes that, based on my training and experience, I know are commonly used to manufacture counterfeit U.S. currency.

18.  BPPD officers continued searching the master bedroom and found over 100 $100 bills.  The bills had visible Vietnamese characters that identified them as printed documents and did not match the bills found in DO's car.  Based on my training and experience, I know that these types of bills are not an official recognized form of legal tender or currency because their sole intended purpose is to be offered as burn offerings to the deceased as part of cultural rituals.

19.   Detective Castro interviewed Huang.  Huang said she had been living with DO for about three years.  Huang denied knowledge of the weapons inside the bedroom and said she did not know if DO owned any firearms.  Detective Castro, through an interpreter, also interviewed Tron.  Tron denied knowledge of the weapons inside the bedroom and said she did not know if DO owned any firearms.  Tron said that only Huang and DO had access to the master bedroom.

20.   On November 22, 2017, SA Teschke and I traveled to the Los Angeles County Jail to interview DO.  Before questioning DO, I advised him of his Miranda rights.  DO agreed to speak with me, but he asked that the interview not be recorded.[1]

## V.    TRAINING AND EXPERIENCE ON COUNTERFEIT CURRENCY

21.   Based upon my training, experience, and conversations that I have had with other law enforcement officers and/or reports that I have read, I am aware that many criminals who manufacture counterfeit bills today are able to do so with a standard computer, scanner, and color inkjet or multi-function printer using the following process:

a.   A counterfeiter must find the right kind of paper to print counterfeit FRNs so that it will be more passable. Normal paper that is used on a day-to-day basis is made from cellulose found in trees; paper used for money is made from cotton and linen fibers.  Rather than create their own paper, a counterfeiter can "bleach" genuine FRNs of lower denominations

---

[1] I do not rely on DO's answers to establish probable cause in this affidavit.

and print higher denominations on top of the genuine FRNs.  The counterfeiter typically soaks the genuine FRNs in a solution made from bleach or other household cleaners and then wipes the ink off the genuine FRNs using a brush or hard plastic card such as a credit or hotel room card.  The counterfeiter than lets the wet FRNs dry before the printing process.

b.    A counterfeiter can place a bill of a higher denomination, such as a $100 FRN, onto the scanner.  The scanner will create a 5 to 10 megabyte file on the computer's hard drive that will be used to print the counterfeit FRN, depending on the type of file chosen.  Once the image is uploaded, a counterfeiter will use a graphics editor program such as Adobe Photoshop installed on his or her computer to change parts of the face of the FRN.  Using a graphics editor program, a counterfeiter can also set up "layers" of the FRN's security features, and subsequently print these layers to mimic the look and feel of multiple layers of ink found on genuine bills.

c.    A counterfeiter can then place the "bleached" genuine FRNs onto a blank piece of paper, and print the higher denomination FRNs onto the bleached genuine FRNs.  A counterfeiter typically has to test-print the scanned image a number of times and adjust the color to get the overall tone as close to the original as possible.  He or she will also have to scan the back plate of the FRN and practice aligning the front and back plates to get a realistic two-sided bill.

d.    Based on my training and experience, I am aware that persons engaged in conspiracies to manufacture and possess

8

counterfeit currency often communicate by cellular telephone calls, text messages, and emails using devices like the SUBJECT DEVICES.  Furthermore, based on my training and experience investigating counterfeiting schemes, I am aware that co-conspirators in such schemes often use cellular telephones similar to the SUBJECT DEVICES to search the internet for information and guidance on the manufacture and detection of counterfeit currency.  Additionally, such persons will take photographs of the counterfeit currency and other contraband using devices like the SUBJECT DEVICES.

## VI. TRAINING AND EXPERIENCE REGARDING DRUG TRAFFICKING OFFENSES

22.  Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.  Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

b.  Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In

addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

      c.  Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

      d.  It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers.  These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

### VII.  <u>TRAINING AND EXPERIENCE ON FIREARMS OFFENSES</u>

23.  Based on my training and experience and information I have obtained from other law enforcement officers who investigate firearms-related offenses, I know the following:

      a.  Many people, including prohibited persons, keep mementos of their firearms and ammunition, including digital photographs or recordings of themselves possessing or using firearms, on their smart phones and digital devices.  Moreover,

prohibited persons who purchase firearms or ammunition illegally, including those who purchase stolen firearms or ammunition, will keep the contact information of the individual who supplied them with the firearms for future purchases or referrals.

b.   Correspondence between persons who possess, buy, and sell firearms or ammunition often occurs by e-mail, text message, and social media message sent to and from smart phones and digital devices.  This includes sending photos of the firearms or ammunition.

### VIII.      TRAINING AND EXPERIENCE ON DIGITAL DEVICES

24.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that it is not always possible to search digital devices for digital data in a single day or even over several weeks for a number of reasons, including the following:

a.   Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment.  There are so many types of digital devices and software programs in use today that it takes time to conduct a thorough search.  In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the type of digital device, operating system, and software application being searched.

b.   Digital data is particularly vulnerable to inadvertent or intentional modification or destruction.

Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

       c.    A single megabyte of storage space is the equivalent of 500 double-spaced pages of text.  A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text.

       d.    Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet.[2] Electronic files saved to a hard drive can be stored for years with little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools.  Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to

_____

[2] These statements do not generally apply to data stored in volatile memory such as random-access memory, or "RAM," which data is, generally speaking, deleted once a device is turned off.

a set block of storage space, for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file.  Similarly, files that have been viewed on the Internet are often automatically downloaded into a temporary directory or cache.  The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content.  Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment.  Recovery also can require substantial time.

e.   Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant.  Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole.  Digital data on the hard drive not currently

associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use. Computer file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

f.   Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on

14

the digital device.  Evidence of the absence of particular data
on a digital device is not segregable from the digital device.
Analysis of the digital device as a whole to demonstrate the
absence of particular data requires specialized tools and a
controlled laboratory environment, and can require substantial
time.

g.   Digital device users can attempt to conceal data
within digital devices through a number of methods, including
the use of innocuous or misleading filenames and extensions.
For example, files with the extension ".jpg" often are image
files; however, a user can easily change the extension to ".txt"
to conceal the image and make it appear that the file contains
text.  Digital device users can also attempt to conceal data by
using encryption, which means that a password or device, such as
a "dongle" or "keycard," is necessary to decrypt the data into
readable form.  In addition, digital device users can conceal
data within another seemingly unrelated and innocuous file in a
process called "steganography."  For example, by using
steganography a digital device user can conceal text in an image
file that cannot be viewed when the image file is opened.
Digital devices may also contain "booby traps" that destroy or
alter data if certain procedures are not scrupulously followed.
A substantial amount of time is necessary to extract and sort
through data that is concealed, encrypted, or subject to booby
traps, to determine whether it is evidence, contraband or
instrumentalities of a crime.  In addition, decryption of
devices and data stored thereon is a constantly evolving field,

and law enforcement agencies continuously develop or acquire new methods of decryption, even for devices or data that cannot currently be decrypted.

25.    Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## IX. CONCLUSION

26.    For all the reasons described above, there is probable cause to believe that ALDO CAOSON DO violated Title 18, United States Code, Section 471 (Making Counterfeit Obligations or Securities of the United States).

_____
Brian L. Anderson
Special Agent
United States Secret Service

Subscribed to and sworn before me
this _____ day of January, 2018.


_____
UNITED STATES MAGISTRATE JUDGE